UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LASALLE NATIONAL LEASING
CORPORATION,

                    Plaintiff,                    No. 03-CV-70482-DT

vs.                                               Hon. Gerald E. Rosen

LYNDECON, L.L.C., CRAIG PASTOR,
TIM PASTOR and JOHN PASTOR,

                    Defendants.
_____/

OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on ___October 25, 2006_____

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

I. INTRODUCTION

        Plaintiff LaSalle National Leasing Corporation ("LaSalle") instituted this breach of

contract action against Lyndecon, L.L.C. ("Lyndecon") and three of its principals, John

Pastor, Craig Pastor and Tim Pastor (collectively, the "Pastors") based upon Defendants'

default under a loan agreement they entered into with LaSalle's predecessor-in-interest,

Meridian Hospitality Corporation ("Meridian").  In its Complaint, LaSalle alleges that

Defendants breached the loan agreement they entered into as borrower and guarantors,

1

and breached the guaranty agreements which secured the loan.

The parties have fully briefed the issues presented and the matter is presently before the Court on Plaintiff's Fed. R. Civ. P. 56 Motion for Summary Judgment. Having reviewed and considered the parties' respective briefs and the entire record of this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

In 1999, Defendant Lyndecon, L.L.C., a Michigan limited liability company, was approached by representatives of Meridian Hospitality Corporation exploring the possibility of Lyndecon's purchasing of five Papa John's restaurants located in the State of Louisiana that were owned by Meridian. Negotiations were subsequently commenced between the parties. Meridian's Vice President, Michael McCoy, conducted the negotiations on behalf of Meridian.

In July 1999, the parties came to an agreement of terms and on July 30, 1999, Lyndecon and Meridian entered into an " Asset Purchase Agreement" pursuant to which Lyndecon purchased all of the assets of five Papa John restaurants located in Monroe, West Monroe, Alexandria, Natchitoches and Leesville, Louisiana, for $775,000. The purchased assets included "all equipment and inventory owned by [Meridian] and used in connection with the restaurants; all customer lists and marketing information pertaining to the restaurants; and all rights title and interests in any leaseholds and related fixtures."

[*See* Defendants' Ex. 1.] Pursuant to the Asset Purchase Agreement, Lyndecon paid $225,000 at the closing.  The balance of the purchase price ($550,000) was to be paid pursuant to a Master Lease Agreement executed by the parties on August 1, 1999. [*See* Defendants' Ex. 2.]

Nine months later, on May 1, 2000, Lyndecon and Meridian executed a "Memorandum of Understanding" for the recited purpose of resolving disputes related to and arising from the Asset Purchase Agreement and Master Lease Agreement transaction. [*See* Plaintiff's Reply Brief, Ex. 1, p. 1.][1]   John Pastor, President of Lyndecon, signed the Memorandum of Understanding on behalf of his company.

Pursuant to the Memorandum of Understanding, the parties agreed that Lyndecon

_____

[1]  The recitals in Memorandum of Understanding state, in relevant part, as follows:

WHEREAS, Lyndecon and Meridian Hospital Corporation, an Indiana Corporation ("MFC") are parties to an Asset Purchase Agreement dated July 30, 1999, pursuant to which Lyndecon purchased certain assets owned by MHC and used by the latter in connection with the operation of five Papa John restaurants located in Monroe, LA, West Monroe, LA, Alexandria, LA, Natchitoches, LA and Leesville, LA (the "Business"); and

WHEREAS, Lyndecon and MFC are parties to a Master Lease Agreement dated August 1, 1999 pursuant to which Lyndecon leased assets from MFC as used in connection with the Business (the transactions contemplated by the Asset Purchase Agreement and the Master Lease Agreement may hereinafter be referred to as the "Transaction,"); and

WHEREAS, the Parties have engaged in continuous discussions regarding disputes related to and arising from the Transaction since the Closing, and the same are collectively desirous of resolving all such disputes.

3

would purchase the assets that were previously subject to the Master Lease Agreement for

$512,400 and that the purchase price would be paid by Lyndecon using the proceeds of a

loan from Meridian in that same principal amount, $512,400.  *Id.* p. 3.  The Memorandum

of Understanding further provided that the loan would be personally guaranteed by John,

Craig and Tim Pastor.  *Id.* p. 4.

Lyndecon further agreed in the Memorandum of Understanding to "release MFC

[Meridian Financial Corporation] and MHC [Meridian Hospitality Corporation] <u>from any

and all claims related to the [Asset Purchase Agreement and Master Lease Agreement]

Transaction</u>."  *Id.* at p. 5 (emphasis added).

The Loan Agreement contemplated by the Memorandum of Understanding was

executed on May 31, 2000, with Meridian as lender and Lyndecon as borrower. [*See*

Complaint Ex. 1.]  Also on that date, May 31, 2000, John, Craig and Tim Pastor executed

personal guarantees guaranteeing payment of the loan.  *See id.*

As contemplated by the Memorandum of Understanding, the Loan Agreement

stated the principal amount of the loan was $512,400.  The maturity date of the loan was

January 1, 2002, the interest rate was 12.50%, and it required 20 monthly installments of

$12,500 beginning May 1, 2000 plus one final "balloon" payment of $354,047.67.  *Id.*

Shortly thereafter, the Loan was assigned to Plaintiff LaSalle National Leasing.

[*See* Plaintiff's Reply Brief, Ex. 2.]

After operating for 19 months under the terms of the Loan Agreement, on March

31, 2002, Lyndecon entered into entered into a First Modification and Extension

4

Agreement with LaSalle which modified the maturity date of the loan and the amount of the monthly payments due thereunder.  Specifically, the modification agreement extended the maturity date of the Loan Agreement from January 1, 2002 to April 1, 2003, and modified slightly the amount of monthly installment by providing for 19 monthly installments of $12,500 (which had already been paid from May 1, 2000 to March 1, 2002), 12 monthly installments of $7,500 beginning April 1, 2002, and one final installment of $354,047.67.  There was no change in the principal and interest amounts.[2]

Lyndecon thereafter defaulted under the Agreement -- it failed to make any of the modified payments in July, August or September 2002.  Consequently, pursuant to the Loan Agreement, all amounts due were accelerated and LaSalle demanded payment of the total sum due under the Modification Agreement of $386,325.68.  LaSalle also sent demand letters to the Pastors for payment of the total amount due pursuant to the Guaranty Agreements they executed.  When no payment was forthcoming, this lawsuit to recover for breach of the agreements was filed.

---

[2]    The only other substantive change was a change in the choice of law provision. The Modification Agreement's choice of law provision provided that the contract was to be governed under the laws of the State of Maryland.  (The original Loan Agreement called for application of Indiana law.)

5

III.  DISCUSSION

A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the standards of review for a summary judgment motion.  These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3]  According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment.  They are summarized as

---

[3]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

6

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential
> element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the
> movant's denial of a disputed fact, but must "present affirmative evidence in order
> to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that
> it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the
> respondent's evidence.  The respondent  must "do more than simply show that
> there is some metaphysical doubt as to the material facts."  Further, "[w]here the
> record taken as a whole could not lead a rational trier of fact to find" for the
> respondent, the motion should be granted.  The trial court has at least some
> discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).  *See also,*

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will

apply the foregoing standards in deciding Plaintiff's Motion for Summary Judgment in

this case.

B.    DEFENDANTS ADMIT THAT THEY ARE IN PAYMENT DEFAULT UNDER
      THE LOAN AGREEMENT AND THE GUARANTEES

Defendants do not dispute that Lyndecon is in payment default under the Loan

Agreement and Modification Agreement.  *See* Lyndecon's Responses to LaSalle's First

Request for Admissions Nos. 5, 6, 7, and 8.  Further, Craig, Tim and John Pastor all admit

that they have failed to make the required payments under their Guaranty Agreements.

7

*See id.*, Responses Nos. 1, 2 and 3. However, Defendants maintain that they are relieved of any obligation to make any payments to LaSalle by virtue of alleged misrepresentations as to the profitability of the Papa John's restaurants made by Michael McCoy, Vice President of Meridian Hospitality, during the 1999 negotiations leading up to Lyndecon's entering into the 1999 Asset Purchase and Master Lease Agreements. They argue that as assignee of Meridian, LaSalle is liable for McCoy's misrepresentations.

According to Defendants, McCoy allegedly represented to them that weekly sales averaged $12,000 per store. Defendants claim that they relied on this representation when they entered into the Asset Purchase and Master Lease Agreement. They further allege that at some unspecified time after the August 1999 closing, they discovered that weekly sales per store never exceeded $9,000. Defendants claim that if had they known that sales were less than $9,000 during the negotiations they would never have agreed to purchase the businesses.[4] However, as discussed below, Defendants may not rely on these allegations of fraud to defend against this action.

---

[4] Defendants' allegations of misrepresentation of the profitability of the stores are also the bases of their five-count counterclaim. In their Counterclaim, Defendants alleged fraudulent and innocent misrepresentation (counts I and II), negligence (count IV) and breach of contract (count V) as well as a claim for exemplary damages (count III), all predicated upon McCoy's alleged misrepresentations. The Court previously dismissed one of the counts of the counterclaim -- Defendants' claim of negligence in count IV -- because Michigan law applies to that claim and Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing, which was what Defendants were alleging in their count IV. *See* September 29, 2005 Opinion and Order.

8

C.    DEFENDANTS EXPRESSLY RELEASED MERIDIAN FROM ANY AND ALL
      CLAIMS RELATED TO THE ASSET PURCHASE AND MASTER LEASE
      AGREEMENTS

As indicated above, the defaults that Defendants incurred are defaults under the

May 31, 2000 Loan and Security Agreement, as modified pursuant to the March 31, 2002

"First Modification and Extension Agreement," and the Guaranty Agreements executed

by John, Craig and Tim Pastor securing the Loan.  The May 31, 2000 Loan Agreement

was entered into pursuant to the May 1, 2000 "Memorandum of Understanding" that

Lyndecon and Meridian entered into to resolve "disputes related to and arising from the

[July 30, 1999 Asset Purchase Agreement and the August 1, 1999 Master Lease

Agreement] Transaction."  The Memorandum of Understanding not only called for the

execution of the Loan Agreement and Guaranty Agreements, but also it further expressly

provided, as part of the resolution of the parties' disputes, that

> **Lyndecon shall release MHC and MFC from any and all claims related
> to the [July 30, 1999 Asset Purchase Agreement and the August 1, 1999
> Master Lease Agreement] Transaction**.

[Plaintiff's Reply Brief Ex. 1, p. 4.]

Under both Maryland and Michigan law, releases are contractual, and they are,

therefore, governed by ordinary contract principles.  *See Bernstein v. Kapneck*, 290 Md.

452, 457-58, 430 A.2d 602 (1981); *Parish v. Maryland & Virginia Milk Producers Ass'n*,

250 Md. 24, 242 A.2d 512 (1968); *see also, e.g*, *Sharpe v. Taber*, 2004 WL 316175

(Mich. App. 2004).  The principal rule governing the interpretation of a release of claims,

as with other contracts, is to effect the intention of the parties. *See Hartford Accident and*

9

*Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership*, 109 Md.App. 217, 290-91, 674 A.2d 106 (1996), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997);  *Batshon v Mar-Que Gen Contractors,* Inc, 463 Mich. 646, 649 n. 4 ;624 N.W.2d 903 (2001).  If the language of a release is clear and unambiguous, the intent of the parties is ascertained from the plain and ordinary meaning of the language. *Id. See also Scarlett Harbor*, 109 Md. App. at 291, 674 A.2d 106 ("The primary source for determining the intention of the parties is the language of the contract itself.")

The interpretation of unambiguous contract terms presents a question of law for the court to resolve.  *Keyworth v. Industrial Sales Co.*, 241 Md. 453, 456, 217 A.2d 253 (1966); *Shapiro v. Massengill*, 105 Md.App. 743, 754, 661 A.2d 202 *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995); *Archambo v. Lawyer's Title Ins. Corp.*, 466 Mich. 402, 408, 646 N.W.2d 170 (2002).  When the language of the contract is clear, the court will presume that the parties intended what they expressed, even if the expression differs from the parties' intentions at the time they created the contract.  *Roged, Inc. v. Paglee*, 280 Md. 248, 254, 372 A.2d 1059 (1977); *Scarlett Harbor*, 109 Md.App. at 291, 674 A.2d 106; 918 *Shapiro*, 105 Md.App. at 754, 661 A.2d 202; *Bernstein v. Kapneck*, 46 Md.App. 231, 244, 417 A.2d 456 (1980), *aff'd*, 290 Md. 452, 430 A.2d 602 (1981).  *See also, Wyrembelski v. St. Claire Shores*, 218 Mich. App. 125, 127, 553 N.W.2d 651 (1996).

The language of the release provision in the Memorandum of Understanding in this case is clear and unambiguous -- Lyndecon agreed to release "any and all claims" relating to the 1999 Asset Purchase and Master Lease Agreement transaction.

10

Furthermore, there is no evidence whatsoever in the record that this release provision was the product of duress or coercion.[5]  Therefore, the plain and unambiguous language of the release must be deemed effective.  Having released "any and all claims" relating to the 1999 Asset Purchase and Master Lease Agreement transaction, Defendants may not now raise alleged misrepresentations made by Michael McCoy during the negotiations surrounding the Transaction either as the basis of their counterclaims or as a means to avoid liability for their payment default under the March 2002 Modification of the May 2000 Loan Agreement.[6]  Only evidence of misrepresentations inducing Defendants to

_____

[5]  Evidence of duress or coercion may invalidate the plain and unambiguous language of a release of claims.  *Brookes v. Holmes*, 163 Mich. App. 143, 145, 413 N.W.2d 688 (1987).

[6]  Furthermore, even if Defendants were able to defend this action and counterclaim based upon misrepresentations made in the course of negotiations leading to the Asset Purchase Agreement, it is doubtful that Defendants' claim of fraud or misrepresentation would be sustained.  One of the required elements of a claim of misrepresentation is reasonable reliance.  Plaintiff cannot satisfy this element.  The 1999 Asset Purchase Agreement contains an integration clause which provides

> This Agreement and the Related Agreements, and their Schedules, contain the entire agreement of the Parties with respect to the purchase and sale of the Purchased Assets and the other transactions contemplated in this Agreement and the Related Agreements, and no representations made by either Party may be relied on unless set forth in this Agreement, the Related Agreements or in the Schedules thereto.

See Defendants' Ex. 1, § 8.4, p. 10. (Emphasis added.)

Under Michigan law, which the parties agree would control here, the existence of such an integration clause in a franchise or asset purchase agreement renders any reliance on alleged misrepresentations made prior to the signing of the agreement unreasonable. *See Cook v. Little Caesars*, 210 F.3d 653, 659 (6th Cir. 2000).  *See also*, *Cook v. Little*

enter into the May 2000 or March 2002 Agreements would support Defendants' claimed defense.

However, there is absolutely no evidence of record that any misrepresentations were made with respect to any of the 2000 and 2002 Agreements.  Indeed, Defendants themselves admit that Michael McCoy was not involved in negotiating any of the 2000 or 2002 Agreements; those agreements, as Defendants themselves admit, were negotiated by David Pauley, President and Chief Executive Officer of Meridian.  *See* Affidavit of John R. Pastor, ¶¶ 10-11; Affidavit of Craig Pastor, ¶¶ 6-7; Affidavit of Tim Pastor, ¶¶ 6-7. Defendants have not alleged that any misrepresentations were ever made by David Pauley.

---

*Caesars*, 972 F. Supp. 400, 412 (E.D. Mich. 1997).

Moreover, the Court notes that during the 10 months between the execution of the 1999 Asset Purchase and Master Lease Agreement and the 2000 Loan Agreement, Defendants appear to have had adequate time to ascertain the correctness of the alleged representations made in 1999 as to the weekly sales of the five restaurants it purchased. By May 2000, Defendants would have had 10 months of sales figures to compare with what they were allegedly told as to weekly sales of the restaurants.  Yet, Defendants never raised any issue as to the discrepancy between what they were allegedly told about the success of the businesses and what they were experiencing themselves.  Nor did they attempt to get out of the deal during that time frame.  Instead, they agreed to continue their relationship with Meridian and in the spring of 2000, re-formed their original agreements and entered into the new Loan and Guaranty Agreements.  They then continued to do business with MFC and its successor-in-interest, LaSalle, for more than two years thereafter never raising any issue as to the deficiency of the weekly sales figures at any time before defaulting on the Loan in July 2002.

12

Defendants having failed to present any legally sufficient defense for their admitted payment default, Plaintiff's Motion for Summary Judgment will be granted.

<u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, GRANTED.  Accordingly, a JUDGMENT OF LIABILITY will be entered in this case in favor of Plaintiff LaSalle National Leasing Corporation and against Defendants Lyndecon L.L.C., Craig Pastor, Tim Pastor, and John R. Pastor.

IT IS FURTHER ORDERED that, within 10 days of the date of this Order, Plaintiff shall submit a verified and documented Affidavit of its damages to date.

IT IS FURTHER ORDERED that Defendants' Counterclaims are dismissed, with prejudice.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  October 25, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 25, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager